**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:  Surfango, Inc.,
       A Michigan Corporation,            Chapter 11
                                     Case No. 09-30972 (RTL)

          Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - -X

**OPINION**

**APPEARANCES:**

Teich Groh
Barry W. Frost, Esq.
Attorneys for Debtor

Stark & Stark
Thomas S. Onder, Esq.
Attorneys for Yuting Rui

Ashford - Schael, LLC
Courtney A. Schael, Esq.
Attorneys for GV Family Investments, LLC

**RAYMOND T. LYONS, U.S.B.J.**

**INTRODUCTION**

       The Debtor, Surfango, Inc., and G.V. Family Investments, LLC ("GVFI") as joint

proponents, seek confirmation of their plan of reorganization that would result in GVFI

increasing its share of stock ownership from 12% to 88% or higher.  Many of the other

shareholders object, including Yuting ("Mike") Rui, the founder and inventor of the Debtor's

products.  The court sustains the objections and will deny confirmation for the following

reasons:

1. The subordination of the shareholder interests of the founder, his brother and another shareholder in China are not warranted in this case. Their treatment in a separate class that will receive nothing discriminates unfairly and is not fair and equitable.

2. The plan is a litigation tactic attempting to award victory to one faction in pending state court litigation among the shareholders. The plan was not proposed in good faith.

3. The testimony that the patent applications and other intellectual property are worthless is incredible. Thus, the proponents have failed to prove that each holder of a claim or interest will receive no less than in a liquidation.

4. The Debtor is a lifeless entity with no operations, employees or revenue. Its value is in the potential of products designed by the founder. No concrete plans for recapitalization have been presented and no projections of future operations have been offered. The proponents have not proven that their plan is feasible and will not likely be followed by the need for further financial reorganization.

## JURISDICTION

This court has jurisdiction of this case and confirmation hearing under 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 157(a) and the Standing Order of Reference by the United States District Court for the District of New Jersey dated July 23, 1984, referring all proceedings arising under Title 11 of the United States Code to the bankruptcy court. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(L) concerning confirmation of a plan.

## FINDINGS OF FACT AND PROCEDURAL HISTORY

Yuting (a.k.a. Mike or Michael) Rui has a Ph.D. in aeronautics and astronautics from

Purdue University.  He has enjoyed a long career employed as an engineer by major U.S. corporations.  In his spare time he tinkered with personal watercraft and, after many years working nights and weekends in his garage, perfected designs for motorized kayaks and surfboards that were not otherwise available on the market.  Mike Rui has obtained approvals from the U.S. Department of Environmental Protection and Coast Guard for his designs.  He applied for four U.S. patents for his inventions and attended numerous industry trade shows where prototypes received enthusiastic responses.  At the Miami Boat Show in 2004 his inventions received the innovation award from the National Marine Manufacturers Association.

Mike Rui formed Surfango, Inc., as a Michigan corporation in 2002.  In the early years all  of the expenses of perfecting the technology, developing the prototypes and attending trade shows were contributed by Mike Rui.  He took no compensation.  In 2005, some friends in the U.S. invested cash in the corporation and were issued stock.  Mike has a brother, Yumin ("Frank") Rui, who lives in China.  Through Frank, Mike arranged to lease factory space from the government in an industrial park in Jurong City, Jiangsu Province, Peoples' Republic of China.  An entity was formed in China, known as Jurong Surfango Sports Equipment Co. Ltd. ("Surfango China") to lease the factory, employ workers, purchase materials and components, manufacture hulls and assemble demonstration models of motorized kayaks and surfboards designed by Mike Rui.  Bank accounts were established in a Chinese bank, the Industrial and Commercial Bank, under a government program to foster development and job creation.  Frank Rui is an authorized signer and perhaps the staff accountant at the factory in China as well.  No one else is authorized to withdraw funds from the bank accounts in China.

Mike's understanding is that Surfango China is part of Surfango, Inc.  He does not

consider it a separate entity, although the government registration in China may list him, not

Surfango, Inc., as the sole owner of Surfango China.  Frank has run the factory under Mike's

direction.  Another investor in China, Wang Min, contributed $300,000 cash to Surfango, Inc.

and was promised shares in the company.  Frank worked without compensation and, likewise,

was promised stock.

As of December 2007, the shareholders of Surfango, Inc. were:

*In the United States:*

| | |
|---|---|
| Yuting (Mike) Rui | 55% |
| Jianhua Wang | 8% |
| You Zhang | 2.5% |
| Masumi Kawatsu | 2.5% |

*In China:*

| | |
|---|---|
| Yumin (Frank) Rui | 20% |
| Wang Min | 11% |
| Yao Chun Yuan | 1% |
| | 100% |

Mike Rui made contacts in the U.S., Canada, New Zealand, Australia, South Africa,

Spain, Saudi Arabia, Ireland, Singapore and Korea who were interested in distributing Surfango,

Inc.'s products.  By mid-2007 Surfango, Inc. had sold about 400 demonstration kayaks and

surfboards but Mike Rui perceived there was demand for much more.  In order to expand

production, Surfango, Inc. needed capital and management.

### *GVFI*

In January 2007, Mike met Gary Sommer at the New York Boat Show.  Mr. Sommer was

involved in the personal watercraft business and had a wide variety of experience in growing

start-up businesses.  He expressed interest in distributing Surfango, Inc.'s products.  Several

months later, Mr. Sommer approached Mr. Rui about  investing in Surfango, Inc. and offered

$2.5 million for 50% of the stock.  Mike Rui rejected that offer.  Subsequently, Mr. Sommer introduced his business associates, Gino Volpacchio and Gary Jablonski.  Gino Volpacchio was the dominant personality in the group.  He has an impressive business resume that includes senior executive positions at internationally known retailers and successful turnaround management.  Gary Jablonski has considerable experience on Wall Street with large investment banks.

In late 2007, Gary Sommer and Gary Jablonski traveled to China with Mike Rui to see the factory operations.  They spent ten days there.  Following that trip, the three investors offered to put $5 million into Surfango, Inc. in exchange for 51% of the stock, control of the board and executive positions.  Mike Rui agreed on behalf of himself and the other shareholders.

### *Investment Agreement*

On January 17, 2008, GVFI, Surfango, Inc. and Mike Rui, on behalf of himself and the other shareholders (the "Existing Shareholders"), entered into a written Investment Agreement. GVFI agreed to invest $5 million in installments to acquire 51% of the stock in Surfango, Inc. Almost half the money was to be distributed among the Existing Shareholders.  The balance of the money would be kept by Surfango, Inc. for working capital and the building of a new, larger factory in China.  The schedule of investment by GVFI was agreed as:

| Date | %Stock | Amount | Surfango | Existing Shareholders |
|------|--------|--------|----------|----------------------|
| Jan. 3, 2008 | 5% | $500,000 | $400,000 | $100,000 |
| Feb. 15, 2008 | 15% | 1,500,000 | 1,050,000 | 450,000 |
| Aug. 15, 2008 | 31% | 3,000,000 | 1,200,000 | 1,800,000 |
| | 51% | $5,000,000 | $2,650,000 | $2,350,000 |

The Investment Agreement gave GVFI a proxy for 51% of the stock upon the initial

5

investment and the right to elect two members of a three-person board.  GVFI appointed Gino

Volpacchio and Gary Jablonski to the board.  Mike Rui retained the right to designate one board

member and appointed himself.  The Board appointed Gino Volpacchio, Chairman, President and

CEO, Gary Jablonski, Executive Vice President and Secretary, Gary Sommer, Executive Vice

President and Chief Operational Officer and Yuting (Mike) Rui, Vice President of Engineering.

The books and records of Surfango, Inc., including financial records and corporate

records, were virtually non-existent.  Financial records at the factory in China were either non-

existent or kept by hand in Chinese and not translated into English.  GVFI could not verify vital

financial information such as units of production, revenue and costs.  They relied solely on the

information provided by Mike Rui and their own business acumen.

Surfango, Inc. and Mike Rui made certain written representations and warranties in the

Investment Agreement  including:

1.  The company's liabilities did not exceed $150,000.

2.  Mike Rui would assign Surfango China to the company.

3.  The company could produce 300 units by February 29, 2009 and 700 per month

thereafter.

GVFI paid the initial $500,000 on January 10, 2008.  Gino Volpacchio, as CEO of

Surfango, Inc., issued checks to Mike Rui and the Existing Shareholders in the U.S. for their pro

rata share of $100,000.  Money for the shareholders in China plus the balance of the funds were

transferred to the Surfango China bank account in China.

### *Second China Trip*

Gino Volpacchio and Gary Jablonski traveled to China with Mike Rui in February 2008

and spent seven to ten days at the factory.  They also saw the vacant land to be the site of the

larger factory.  The rate of production was disappointing and had not come close to the number of

units in the representation and warranties.  None of the employees in China spoke English, so Mr.

Volpacchio, who does not speak Chinese, had to rely on Mike Rui to translate.  Whatever records

had been kept in China were not given to Mr. Volpacchio despite his request, and they would not

have been useful in any event because they were in Chinese.  He insisted that the factory

implement a computerized financial recordkeeping system in English with frequent reporting

back to him in the U.S.  He also requested signing authority and control of the Chinese bank

accounts.  That was never accomplished.

     Nevertheless, Mr. Volpacchio wrote to Mike Rui on March 14, 2008:

> Hi Mike,
>
> We really enjoyed our trip to China and we are all looking forward to
> making Surfango a very successful company.
>
> We were very impressed with the design and engineering of the
> Surfango product.  It appears that we are making progress in
> improving our assembly processes and overall quality control.  As we
> discussed during our trip, many of the processes in assembly need to
> be simplified and quality control must always remain our first priority.
>
> It is apparent from our meeting that since our funding on January 10,
> 2008, we are still struggling to consistently produce high quality
> products daily.  It appears that we have been producing less than seven
> units per day since our initial investment.  The internal reporting at
> Surfango China showed that 7 of the 13 days in March 2008 had no
> units assembled.  We all expected much more at this stage of our
> business.
>
> As you know, the intent of our agreement was to provide the initial
> funding so Surfango could produce and ship 1,700 units by the end of
> March 2008.  Our goals were to scale up and reach that goal within 90
> days of our funding or sooner.  You were very persistent and
> persuasive during our negotiations that achieving these goals were

realistic and that we would ramp up to at least 1,000 units per month
prior to moving into a new warehouse.

Regardless of the reasons for Surfango's inability to meet these goals,
Gary S., Gary J., Frank J. and I are all committed to making this an
enjoyable and successful venture for ourselves, you, Frank and all
your shareholders.

We are excited about meeting the challenges and we are confident that
with professional management, hard work and focus we will all
achieve our goals.

A written Amendment to the Investment Agreement was signed on March 17, 2008.  It
reduced the second installment from GVFI to $700,000 rather than $1.5 million with all of the
money going to the company; none to the Existing Shareholders.  Further disbursements to the
Existing Shareholders would be tied to achieving stated levels of production.  GVFI paid
$700,000 to Surfango, Inc. that was immediately transferred to Surfango China's bank accounts.

Frank Rui used $330,000 to acquire rights to vacant land in the industrial park where the
new factory was to be built.  Although initially the land acquisition was approved, Gino
Volpacchio countermanded the approval prior to Frank's disbursement of funds in China.  GVFI
has information that the rights to the vacant land were placed in a new entity controlled by Mike
Rui and not Surfango, Inc.

The accountant at the Chinese factory prepared a balance sheet and income statement for
the periods ending December 31, 2007 and March 31, 2008.  Mr. Volpacchio compared those
statements with the representations in the Investment Agreement and found several discrepancies.
Inventory was lower than represented.  Accounts payable were higher than represented, including
a debt to Mike Rui's sister that had not been disclosed.  Mr. Volpacchio also prepared his own
accounting of how the $1.2 million invested by GVFI had been expended, and documented it in

an email message dated April 13, 2008: $100,000 was paid to shareholders, $46,000 to Rui's

sister, $300,000 for old payables, $333,000 for land, $321,000 for new payables and prepayments

to vendors, and approximately $100,000 left in the bank account in China.

Gino Volpacchio hired a bi-lingual man in China, Tony Lo, to be factory manager.  After

some time Mr. Volpacchio complained that Tony Lo was not receiving cooperation from Frank

Rui and the other employees at the factory in China.  Additional disagreements arose regarding

production deficiencies, lack of accounting records, and Gino Volpacchio's lack of control of

funds in China.  The relationship between Mike Rui and GVFI deteriorated with accusations

going both ways.  Rui claimed that delay and lack of funding from GVFI was hindering

production.  Tony Lo was not allowed in the factory.  The Rui brothers arranged to ship finished

goods directly to customers and requested payment to the Chinese bank account.  The Chinese

shareholder, Wang Min, came into the factory and took some finished product.

### *Michigan Litigation*

In June 2008, Surfango, Inc. (controlled by GVFI) filed suit in Michigan state court and

obtained a temporary restraining order against Mike Rui.  The state court in Michigan issued a

preliminary injunction against Mike Rui on June 18, 2008 prohibiting him from interfering with

Surfango, Inc.'s operations or assets.  Despite the injunction, Mike Rui issued stock certificates to

his brother and Wang Min to document the interests that were promised to them.  Subsequently,

the state court appointed Gino Volpacchio attorney-in-fact for Rui to assign his patent

applications to Surfango, Inc.  After winning the initial skirmishes in state court, Surfango, Inc.

appears to have taken no further action in pursuing its claims against Mike Rui.  Gino Volpacchio

testified that Surfango, Inc. had incurred several hundred thousand dollars in legal fees, a large

part of which remains unpaid.

Mike Rui resigned as an officer and director of Surfango, Inc. on July 7, 2008.  He reserved his right to designate the third director but has not done so.  A year later, Mike Rui filed his own complaint against Gino Volpacchio, Gary Sommer and Gary Jablonski in the Michigan state court.  That complaint was dismissed with prejudice by summary disposition on July 13, 2009.  In the suit where Surfango, Inc. is the plaintiff, Mike Rui moved to be reinstated as a director.  The Debtor filed bankruptcy one day before the hearing scheduled in the Michigan court and the proponents' disclosure statement says that litigation has been stayed.[1]

Surfango, Inc. ceased production when the dispute among the shareholders broke out in May 2008.  A few hundred finished products previously made, were sold.  Other finished products as well as parts inventory, machinery, tools and equipment remain idle in the factory in Jurong City.  Gino Volpacchio has loaned money to the company to fund legal fees for the litigation, re-engineering of the products and locating other facilities to start up manufacturing in China and U.S. operations in Tampa, Florida.  Gino Volpacchio, as attorney-in-fact for Mike Rui, signed license agreements and assignments of patents to Surfango, Inc. and applied for patents in foreign jurisdictions.  At the time of the confirmation hearing one patent had been issued by the U.S. government.

GVFI recognizes that Surfango, Inc. needs an infusion of capital to restart manufacturing and distribution but is unwilling to fulfill the balance of its investment commitment as long as Mike Rui and his brother Frank remain involved.  GVFI also claims no other investors will

---

[1] However, the automatic stay only applies to claims against the Debtor, not to actions brought by the Debtor.  *Maritime Elec. Co., Inc. v. United Jersey Bank (In re Maritime Elec. Co., Inc.)* 959 F.2d 1194, 1204 (3d Cir. 1992).  It is not clear to this court why the Debtor has not pursued the litigation in Michigan against Mike Rui that it started in June 2008.

participate with the Rui brothers.

### *Bankruptcy*

Surfango, Inc. filed a voluntary petition under chapter 11 of the Bankruptcy Code on

August 11, 2009 with the goal of eliminating the Rui brothers and garnering super-majority

shareholder control in GVFI.  The Debtor designated itself a small business debtor as defined in

Section 101(51D) of the Bankruptcy Code.  The schedule of unsecured creditors is eighteen pages

long with approximately ninety creditors, but nearly all creditors are scheduled as disputed with

zero dollars as the amount of their claims.  The only significant, non-insider unsecured creditor

listed by the Debtor is the law firm that represented it in the Michigan litigation.  Only a handful

of non-insider unsecured creditors have filed a proof of claim with the only significant amount by

the Michigan law firm.  The only secured creditor is Gino Volpacchio and there are small priority

debts to the state and federal taxing authorities.  The Debtor was under no pressure from non-

insider creditors; no law suits or other collection actions were pending.  The only litigation

disclosed in the Debtor's statement of affairs was the Michigan suit against Mike Rui.

The day after filing the petition, the Debtor sought expedited conditional approval of a

disclosure statement and a confirmation hearing the next month.  The court denied conditional

approval and scheduled a hearing on the adequacy of the disclosure statement for September 14,

2009.  A First Modified Disclosure Statement for the plan proposed by the Debtor and GVFI was

approved on September 23, 2009 and a hearing on confirmation scheduled for November 9, 2009.

Mike Rui and several of the Existing Shareholders rejected the plan and objected to confirmation.

### *Plan*

The Plan creates seven classes of claims and interests:

Class 1: Secured Claim of Gino Volpacchio
Class 2: Non-Tax Priority Claims
Class 3: General Unsecured Claims
Class 4: Warranty Claims
Class 5: GVFI's Claims
Class 6: Equity Interests
Class 7: Subordinated Equity Interests

Only four non-insider, unsecured creditors in Class 3, with claims totaling $169,552.51,

voted in favor of the plan. That class is dominated by the law firm that represented Surfango, Inc.

in the Michigan litigation. Class 6 Equity Interests rejected the plan and Class 7 is deemed to

reject the plan since they receive nothing under it.

Gino Volpacchio testified for the proponents. Mr. Volpacchio is willing to let the

proceeds of sale of the remaining inventory, on which he has a lien, be used to fund the

administration expenses of the bankruptcy case. He will loan the Debtor approximately $100,000

to pay the small priority tax debts and a dividend to unsecured creditors. The principals of GVFI

are willing to defer payment on their accrued salary claims and unsecured loans until sometime in

the future. Mr. Volpacchio will also extend a $200,000 line of credit to keep the reorganized

Debtor afloat until new investors can be found. He testified that he believes Surfango, Inc. will

be successful in restarting operations from scratch although no projections of operation were

offered in evidence.

Unsecured creditors in Class 3 who are not insiders are promised fifty percent (50%) of

their allowed claims or a pro rata share of $100,000, whichever is less. Gino Volpacchio testified

that the patent, patent applications and other intellectual property have no ascertainable value at

this time. All of the tangible assets of the debtor are secured by liens in favor of him that exceed

their value. In his opinion, if the Debtor were liquidated, unsecured creditors would receive

12

nothing, so he believes the plan treats them more favorably than in chapter 7.

The key for the proponents is Class 7, consisting of Mike Rui, his brother Frank, and the third shareholder in China, Wang Min, whose stock interests are to be cancelled and who are deprived of an opportunity to receive new stock in the reorganized debtor. This so-called subordination gives rise to the result sought by GVFI - the elimination of the Rui brothers. As explained below, the treatment of GVFI in Class 5 and the other Existing Shareholders in Class 6 elevates GVFI's shareholdings from 12% to 88% or more.

The disclosure statement accuses the Rui brothers of stealing corporate assets and embezzling the money that GVFI invested in Surfango, Inc. These serious allegations of criminal behavior are all premised on the inability of Gino Volpacchio and the new management to obtain records of the Chinese bank account used by the factory in China or any records from the factory to show how the money was expended. The testimony of both Gino Volpacchio and Mike Rui at the confirmation hearing confirmed that parts were delivered to the factory, employees performed work, goods were produced and shipped, and money was paid to secure vacant land on which to build a new factory. There is ample evidence that a substantial amount of the funds that Mr. Volpacchio transferred into the bank account in China must have been used for legitimate purposes. Mr. Volpacchio himself accounted for the expenditure of the $1.2 million investment in his April 13, 2008 email message. There is no direct evidence of theft or embezzlement by either Mike or Frank Rui. The proponents would place the burden on Mike and Frank to account for the money that Mr. Volpacchio transferred to the Chinese bank account and, if they cannot, infer that they must have stolen the money. However, the proponents own evidence shows that Mr. Volpacchio knows exactly where the money went. He documented it in his April 13, 2008

message.  Having heard the testimony of Mike Rui and observed his demeanor, the court concludes that he testified truthfully.  To the best of his knowledge all funds transferred into the Chinese bank account were expended for proper corporate purposes on behalf of Surfango, Inc. He testified that there is a large quantity of parts and inventory, as well as machinery, equipment and tools still at the factory in Jurong City and that all those assets belong to Surfango, Inc.

Of course, some of the known disbursements are in dispute; for example, the vacant land. Although the initial instructions from Mr. Volpacchio directed that the land be purchased, he claims that he countermanded that instruction before Frank Rui paid for the land.  In addition, the proponents claim, without documentation, that the rights to the land were put in a new entity controlled by Mike Rui and not in Surfango, Inc. or Surfango China.  Also, the repayment of a loan from Mike Rui's sister is disputed as an undisclosed liability of Surfango, Inc.  Lastly, once the rift occurred, the Rui brothers shipped goods from the factory to customers and requested payment to the bank account in China.  At best, these disputed items give rise to a claim for damages but do not amount to theft or embezzlement.

GVFI is treated in Class 5 as having an allowed claim of $1,447,800 based upon being fraudulently induced to invest in the Debtor.  That claim is the basis for GVFI participating with other former shareholders in the issuance of new stock by the reorganized Debtor.  Existing Shareholders, excluding the Rui brothers and Wang Min, are treated in Class 6.  They are permitted to share pro rata with GVFI in the new stock to be issued by the reorganized Debtor based upon the cash that they can prove they invested in Surfango, Inc.

Three of the Existing Shareholders have filed proofs of interest showing that they invested money in Surfango, Inc. as follows:

14

|  |  | *Shares* | *Percentage* |
|---|---|---|---|
| Jianhua Wang | $100,000 | 8,000 | 7.04% |
| You Zhang | $50,000 | 2,500 | 2.20 % |
| Masumi Kawatsu | $50,000 | 2,500 | 2.20 % |

GVFI disputes that any of the Class 6 shareholders has a valid interest in the Debtor and has challenged their proofs of interest.  If GVFI successfully challenges those shareholders it would receive 100% of the stock in the reorganized Debtor.  On the other hand, if all of these Existing Shareholders qualify for issuance of new stock by the reorganized Debtor, the post confirmation shareholding would be calculated by adding $200,000 to GFVI's Class 5 claim of $1,447,800 to get a denominator, with each shareholder's dollar investment as the numerator. That yields:

| GVFI | 88% |
|---|---|
| Jianhua Wang | 6% |
| You Zhang | 3% |
| Masumi Kawatsu | 3% |
|  | 100% |

## DISCUSSION

Section 1129(a) of the Bankruptcy Code directs the court to confirm a plan of reorganization only if all the requirements of that section are satisfied.  In this case the relevant subsections of 1129(a) are:

(3) The plan has been proposed in good faith,

(7)(A)(ii) each holder of a claim or interest will receive property of a value that is

15

not less than if the debtor were liquidated under chapter 7,

(11) Confirmation of the plan is not likely to be followed by liquidation or the

further need for reorganization of the debtor.

Also, where a class has rejected the plan, the court may confirm the plan over their

objection only if the plan does not discriminate unfairly and is fair and equitable.  11 U.S.C. §

1129(b)(1).  Class 6, the Existing Shareholders, voted to reject the plan.  Class 7 is deemed to

have rejected the plan since the members will receive nothing.  11 U.S.C. § 1126(g).

### *Good Faith*

The court may confirm a plan only if it has been proposed in good faith.  11 U.S.C. §

1129(a)(3).  Two relevant inquiries deserve focus: (1) whether the plan serves a valid bankruptcy

purpose, e.g., by preserving a going concern or maximizing value, and (2) whether the plan is

proposed to obtain a tactical litigation advantage.  *In re Integrated Telecom Express, Inc.*, 384

F.3d 108, 119-20 (3d Cir. 2004); *In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir. 1999).

The proponents admittedly filed this plan to get rid of the Rui brothers as shareholders,

something they had not accomplished in the Michigan state court litigation in more than a year.

Surfango, Inc. was not a going concern when the petition was filed.  The prospects for breathing

life and growth into the start-up enterprise that seemed so promising in January 2008 have

vanished in the shareholder dispute.  The company has no jobs to save and the proponents

maintain that no value can be realized from the intellectual property owned by the company.

The plan serves only as a litigation tactic for one faction of the feuding shareholders to

cast off the others.  That does not serve a traditional bankruptcy purpose.  This is not to suggest

that shareholders cannot be wiped out in chapter 11; frequently they are.  Certainly, a legitimate

16

plan might cancel old equity and offer new equity to those prior shareholders or others

contributing new value. *See Bank of Am. Nat'l Trust & Saving Ass'n v. 203 N. LaSalle St. P'ship,*

526 U.S. 434 (1999). However, this plan seeks to elevate GVFI from a 12% shareholder to 88%

or higher without any contribution of new value. Its primary purpose is to award victory to one

side of the shareholder dispute, side-stepping the state court, with the faint hope of resuscitating

the company that was mortally wounded in its infancy by the factional strife. The proponents

have not proved by a preponderance of the evidence that their plan was proposed in good faith.

### *Best Interest Test*

In order for a plan to be confirmed, impaired creditors and claim holders (who do not

accept the plan) must "receive or retain . . . property of a value, as of the effective date of the

plan, that is not less than the amount that such holder would so receive or retain if the debtor were

liquidated under chapter 7 of this title." 11 U.S.C. § 1129(a)(7). Commonly referred to as the

Best Interest of the Creditors Test, Section 1129(a)(7) requires the proponent to proffer a

hypothetical liquidation as evidence that the requirement is met. *See* H.R. REP. NO. 95-595 at 412

(1977), *as reprinted in* 7 COLLIER ON BANKRUPTCY ¶ 1129.LH (Alan N. Resnick & Henry J.

Sommer eds., 2009).

The court must first determine the value of all property of the estate, as of the effective

date of the plan. H.R. REP. NO. 95-595 at 414 (1977), *as reprinted in* 7 COLLIER ON BANKRUPTCY

¶ 1129.05 (Alan N. Resnick & Henry J. Sommer eds., 2009). Next, the court must estimate the

distribution to secured creditors and unsecured creditors in the order of their priority under

chapter 7. *Id.* This is followed by a comparison of "liquidation value" anticipated for each

claimant against the present value of the distribution to that claimant under the proposed plan. 11

17

U.S.C. § 1129(a)(7).

The parties here do not take issue with the Debtor's assessment of what comprises property of the estate; however, they do take issue with the valuation of certain assets, most significantly, the patent applications and other intellectual property owned by the Debtor.  The proponents' liquidation analysis asserts that the Debtor has minimal inventory that has been pledged to Mr. Volpacchio and is worth less than the debt.  The remaining assets are the patent applications and other intellectual property and the causes of action[2] against the Rui brothers and Wang Min.  Mr. Volpacchio testified that the patent applications are worthless or cannot be valued at this time because the patent applications are not marketable until the patents are actually issued and only have value to the Debtor in the context of a going concern.  His testimony is incredible in light of the following:

> 1. GVFI agreed to pay $5 million for 51% of the stock of Surfango, Inc. based upon the potential for its products, not on any track record of profits or sales.
>
> 2. GVFI has spent hundreds of thousands of dollars for legal fees in the Michigan litigation and this bankruptcy case, trying to wrest ownership of Surfango, Inc. and the inventions from Mike Rui.
>
> 3. GVFI believes these products have a promising future that will warrant further capital investment by them or others.

"The value of intangible personal property comes from the legal rights, the intellectual

---

[2] In their liquidation analysis, the proponents complain that the Debtor anticipates difficulty collecting any judgment awarded to it for its claims against the Rui brothers and Wang Min.  Even without the causes of action, which did not exist at the time GVFI invested in the Debtor, the Court believes the proponents have grossly undervalued the Debtor's assets, primarily in light of the patent applications.

property content and/or the expected economic benefits that are associated with that intangible asset." Robert F. Reilly, *The Identification of Intangible Assets for Bankruptcy Purposes*, AM. BANKR. INST. J., Sept. 2008, at 40, 42 (in order for intangible personal property to be considered an asset, it must have the ability to be "owned" and it must have value). The actions of, and financial contributions made by, GVFI support the conclusion that the patent applications have considerable value. The applications have the potential to bestow valuable legal rights and future economic benefits upon their owner.

As Mr. Rui points out, the plan proponents make no attempt whatsoever to value the intellectual property owned by the Debtor. This, combined with GVFI's contradictory actions, leads the Court to conclude that the plan proponents have not met their burden of proving compliance with Section 1129(a)(7).

### *Feasibility*

Section 1129(a)(11) requires feasibility: "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

Mr. Rui objects to confirmation of the plan because it is not feasible and therefore violates Section 1129(a)(11). Rui points to a cash flow problem, concluding that without additional loans, the Debtor will continue to lose money. Specifically, Rui contends that the Debtor has no manufacturing facilities, a finite inventory, no employees other than the investors (GVFI), no new orders or sales, and significant debts including warranty obligations. The proponents offer sufficient proof that the Debtor will be able to fund the plan, but offer no evidence to support the

company's sustenance, such as projections of the Debtor's future operations.  The proponents

believe the Debtor can emerge as a viable business with the following efforts: (1) a $200,000

revolving line of credit furnished by Mr. Volpacchio to fund the Debtor's operations; (2) deferral

of payment of GVFI's claim; (3) sale of additional shares of new common stock (the proponents

plan to amend the certificate of incorporation to authorize two million shares at $1.00 par value

per share, one million of which will be sold to raise capital); and (4) demand for the product,

combined with sales efforts and a business plan to attract new investors.

"[A] plan proponent has the affirmative burden of proving that its plan satisfies the

provisions of § 1129(a) by the preponderance of the evidence." *In re Union Meeting Partners*,

165 B.R. 553, 574 (Bankr. E.D. Pa. 1994), *aff'd*, 52 F.3d 317 (3d Cir. 1995); *see also Acequia

Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1358 (9th Cir. 1986); *In re Greate Bay Hotel

& Casino, Inc.*, 251 B.R. 213, 220-21 (Bankr. D.N.J. 2000) ("The proponent bears the burden of

establishing the plan's compliance with each of these requirements.  Creditors objecting to the

proposed plan bear the burden of producing evidence to support their objection.").

The proponent must present a plan that has a reasonable likelihood of succeeding and does

not represent a mere "visionary scheme"; however, a guarantee of success is not required.

*Berkley Fed. Bank & Trust v. Sea Garden Motel & Apartments (In re Sea Garden Motel &

Apartments)*, 195 B.R. 294, 304 (D.N.J. 1996) (citations omitted); *see also Fin. Sec. Assurance,

Inc. v. T-H New Orleans Ltd. P'shp (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 801 (5th

Cir. 1997) (requiring a "reasonable assurance of commercial viability"); *Kane v. Johns-Manville

Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (finding a "reasonable assurance of success" based on

extensive evidence of feasibility, "credible projections of future earnings," and well-researched

and supported predictions regarding future claims brought against the Trust); *Pizza of Hawaii,*

*inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374 (9th Cir. 1985) (rejecting plan's

feasibility because the proponent has not estimated a substantial claim against the debtor); *Greate*

*Bay Hotel*, 251 B.R. at 226 ("Although the standards for determining feasibility are not rigorous, .

. . the court is obligated to independently evaluate the plan and determine whether it offers a

reasonable probability of success.").

    The court in *Sea Garden Motel* affirmed the bankruptcy court's confirmation of a plan

because the plan "had a reasonable prospect of success," giving the most weight to the post-

petition changes made by the debtor - "the extent to which the debtor has changed its ways." 195

B.R. at 305-07.  Specifically, the debtor obtained a Social Services contract that would increase

occupancy of the hotel and generate increased profits.  *Id.* at 305-06.  Unlike the plan proponents

in the case at hand, the debtor in *Sea Garden Motel* substantiated its plan with projections of

future earnings and specifics as to how the plan would be effectuated.

    The court in *Greate Bay Hotel* applied a six-factor test used by other bankruptcy courts in

the circuit to determine whether two competing plans were feasible.  251 B.R. at 226.  The factors

are:

> (1) the adequacy of the debtor's capital structure;
> (2) the earning power of its business;
> (3) economic conditions;
> (4) the ability of the debtor's management;
> (5) the probability of the continuation of the same management; and
> (6) any other related matters which determine the prospects of a
> sufficiently successful operation to enable performance of the
> provisions of the plan.

*Id.* at 226-27 (citing *In re Temple Zion*, 125 B.R. 910, 915 (Bankr. E.D. Pa. 1991); *In re*

*Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr. D.N.J. 1980)).  In *Greate Bay Hotel*, the

court found the confirmed plan feasible based on expert testimony as to the capital structure of

the debtor and its viability for future operations in light of a $65 million cash infusion by the plan

proponents and reduction of debt obligations to $110 million.  251 B.R. at 227.  The court also

relied on the earnings projections of the debtor and the fact that the debtor was ahead of schedule

to meet its goals.  *Id.*  Although not given much weight by the court, the proponents in *Greate*

*Bay Hotel* also introduced testimony of the changes the debtor has made in order to survive - the

debtor hired a new and "highly experienced" CEO, the CEO implemented cost-saving strategies,

and the debtor began making improvements to the premises and innovating itself in other ways.

*Id.*

Conversely, in *In re Tracey Services Co., Inc.*, 17 B.R. 405 (Bankr. E.D. Pa. 1982), the

court found no "reasonable likelihood of reorganization" (in the context of a motion to convert

the case to chapter 7) when the debtor had little to no property, no accounts receivable being

collected, no unencumbered assets, and was not generating any income.  17 B.R. at 409.  The

court summarized: " To establish a reasonable likelihood of reorganization, the proposed

rehabilitation must be more than a nebulous venture."  *Id.* at 410 (citation omitted).

Although the plan proponents are correct in arguing that the court has significant

flexibility in determining whether a proposed plan is feasible under Section 1129(a)(11)[3] and that

the threshold of proof is relatively low[4], a plan that "provides no basis upon which to conclude

---

[3] "As with many provisions of the Bankruptcy Code, the statutory language articulating the feasibility
requirement is sufficiently broad so as to have provided a great deal of latitude to Courts interpreting its provisions."
*In re Eddington Thread Mfg. Co., Inc.*, 181 B.R. 826, 832-33 (Bankr. E.D. Pa. 1995).

[4] "At bottom, it is clear that the feasibility inquiry is peculiarly fact intensive and requires a case by case
analysis, using as a backdrop the relatively broad parameters articulated in the statute. In this respect, however, it is
clear that there is a relatively low threshold of proof necessary to satisfy the feasibility requirement." *Id.* at 833
(citing *Matter of Briscoe Interprises, Ltd., II*, 994 F.2d 1160, 1166 (5th Cir. 1993).

that it is feasible within the meaning of 11 U.S.C. § 1129(a)(11)" is reversible error.  *Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994, 1005 (E.D. Va. 1994); 7 COLLIER ON BANKRUPTCY ¶ 1129.02 (Alan N. Resnick & Henry J. Sommer eds., 2009).

In the case at hand, GVFI has not provided the court with sufficient evidence to demonstrate a reasonable likelihood of successful reorganization.  The proponents rely on Mr. Volpacchio's $200,000 line of credit and a prayer for new investors to jump-start the Debtor's near non-existent business operations and to pay the bankruptcy claim owed GVFI and any other deferred creditors and interest holders.  No projections of future earnings were presented*,* nor any other evidence of how GVFI intends to run a successful operation and avoid liquidation or further reorganization.

### *Cramdown & Subordination of Equity Interests*

In order for the plan to be confirmed on a consensual basis, Section 1129(a)(8) requires that each class of claim or interest holders either accepts the plan or is not impaired under the plan.  11 U.S.C. § 1129(a)(8); *see also 203 N. LaSalle St. P'ship*, 526 U.S. at 440-41.  The "alternate route to confirmation" provided for in Section 1129(b) is known as the "judicial 'cramdown' process."  *203 N. LaSalle St. P'ship*, 526 U.S. at 441.  Two conditions must be met before a cramdown may occur: (1) "all requirements of § 1129(a) must be met (save for the plan's acceptance by each impaired class of claims or interests, see § 1129(a)(8));" and (2) "the objection of an impaired creditor class may be overridden only if 'the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.'" *Id.* (quoting 11 U.S.C. § 1129(b)(1)).  Because Mr. Rui, his brother, and Wang Min, the sole occupants of Class 7, reject the plan, confirmation would

require a cramdown of their interests.  The proposed plan subordinates Class 7 shareholders to all

other shareholders and provides for the cancellation of their stocks and no opportunity to

participate in the issuance of stock in the reorganized debtor.  In order to meet the requirement

that the plan not discriminate unfairly and be fair and equitable, the proposed subordination must

be warranted.

## I. Equitable Subordination

The plan proponents seek to subordinate the equity interests of the Class 7 shareholders

(comprising 88% of the Existing Shareholders) to the equity interests of all other shareholders,

pursuant to Section 510(c) of the Bankruptcy Code.  11 U.S.C. § 510(c) (2009).  ("[T]he court

may - under principles of equitable subordination, subordinate for purposes of distribution all or

part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest

to all or part of another allowed interest.").  The plan proposes to cancel all shares of the Debtor's

common stock.  While the other shareholders (Class 6) have the option of receiving their

percentage share of the reorganized Debtor's common stock, the Rui brothers and Min (Class 7)

will not receive or retain any property or distributions under the plan.  GVFI reasons that the

Class 7 shareholders engaged in misconduct by embezzling the money invested by GVFI and

stealing the Debtor's corporate assets, crippling sales and production and rendering the Debtor

insolvent.

Mr. Rui objects to the subordination of his interest.  Both sides agree that the test adopted

by the Third Circuit in *Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding*

*Unsecured Claims,* 160 F.3d 982 (3d Cir. 1998), applies in this situation.  This three-factor test

requires a showing that: "(1) the claimant . . . engaged in some type of inequitable conduct, (2)

the misconduct . . . resulted in injury to the creditors or conferred an unfair advantage on the

claimant, and (3) equitable subordination of the claim must not be inconsistent with the

provisions of the bankruptcy code." *Citicorp*, 160 F.3d at 987 (citing *United States v. Noland*,

517 U.S. 535, 116 (1996)). Mr. Rui argues that there is no proof to support GVFI's allegations of

misconduct and that subordination would not be consistent with the provisions of the code.

In *Citicorp*, the plan proponent was able to prove that the interest holder/opponent

engaged in conduct akin to inequitable conduct of a fiduciary. *Id.* The findings of fact were

specific and the finding of improper conduct was well supported by existing case law. *Id.* Here,

GVFI failed to prove that Mr. Rui engaged in any sort of inequitable or illegal conduct, as

detailed in the factual findings, *supra*. Courts are not permitted to apply equitable subordination

based on their own perception of what is equitable and what is not. *Nolan*, 517 U.S. at 540.

Because the Court finds that GVFI's subordination attempt fails to satisfy the first factor of the

*Citicorp* analysis, it is unnecessary to address the second and third factors.

**II. Cramdown**

   **A. Unfair Discrimination**

Even assuming, *arguendo*, that all the requirements of Section 1129(a) were met by

GVFI's plan, the second requirement for a permissible cramdown has not been met. The

impermissible subordination of Class 7's interests amounts to unfair discrimination. *See Greate

Bay Hotel*, 251 B.R. at 228 ("The hallmarks of the various tests have been whether there is a

reasonable basis for the discrimination, and whether the debtor can confirm and consummate a

plan without the proposed discrimination."). In *Greate Bay Hotel*, the court undertook to

determine whether or not there was unfair discrimination in a plan that proposed to pay unsecured

creditors 80% - 100% on their claims, while the old noteholders, a class of equal priority, would receive their pro rata share of new notes and new common stock. *Id.* at 223. The court adopted the following test that, if satisfied, presents a "'rebuttable presumption that a plan is unfairly discriminatory:'"

> "[W]hen there is: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution."

*Id.* at 228-29, 231 (quoting *In re Dow Corning Corp.*, 224 B.R. 696, 702 (Bankr. E.D. Mich. 1999)). GVFI's plan clearly creates this rebuttable presumption of unfairness. Shareholders in Class 6 and Class 7 are the same priority but receive *vastly* different treatment. Insufficient evidence was presented to rebut this presumption. Furthermore, the hallmarks of unfair discrimination, as mentioned in *Greate Bay Hotel*, are present here. The Code does not permit the proposed subordination; therefore, there is no "reasonable basis" for the discrimination, nor is it inconceivable that the debtor could confirm and execute a plan absent the subordination of select shareholder interests.

## B. Fair & Equitable

Furthermore, the plan is not "fair and equitable" as required by Section 1129(b)(2). The Code sets forth conditions that amount to fair and equitable:

> [T]he condition that a plan be fair and equitable with respect to a class includes the following requirements: (C) With respect to a class of interests - (i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is

26

> entitled, any fixed redemption price to which such holder is entitled,
> or the value of such interest; or (ii) the holder of any interest that is
> junior to the interests of such class will not receive or retain under the
> plan on account of such junior interest any property.

11 U.S.C. § 1129(b)(2)(C).  While it appears that the proponent's plan satisfies Section

1129(b)(2)(C)(ii), "§ 1129(b)(2)(C), by it[s] terms, is not exclusive."  *In re Johns-Manville Corp.*,

68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, 843 F.2d 636

(2d Cir. 1988) .  In *Johns-Manville*, the court considered the issue of subordination with respect to

the plan's fairness - "a court may and should take additional factors into consideration in

determining whether a plan is fair and equitable with respect to a dissenting class."  *Id.* (citation

omitted).  In the present case, the court must take into consideration the impermissible

subordination of the Class 7 shareholders' interests.  Having determined that there is no

justification for subordinating the interests of the Class 7 shareholders, the court finds that

treating them separately and depriving them of any stock in the reorganized Debtor not only

discriminates unfairly, but does not treat Class 7 shareholders fairly and equitably.  The plan may

not be confirmed over their objection.

### III. Class 6

If the subordination of the Class 7 shareholders were not permitted and they were treated

along with other shareholders in Class 6, the plan would still be unfair and inequitable to them

because of the formula for issuing new shares in the reorganized Debtor.  The formula allocates

new shares only to those shareholders who can prove that they invested cash in the Debtor.  At

the inception of the corporation in 2002, Mike Rui was the sole shareholder.  As the founder, he

held 100% of the issued and outstanding stock.  Subsequently, his percentage of ownership

decreased as new investors came on board.  At the end of 2007 he owned 55% of the stock.

Following the investment by GVFI in 2008, his percentage decreased to 48.4%.  Assuming that

Mike Rui cannot prove that he invested money for his stock, he would not receive any new shares

in the reorganized Debtor under the formula in Class 6.

Similarly, Frank Rui held 20% of the stock in the Debtor at the end of 2007.  Following

the investment by GVFI in 2008, his percentage went down to 17.6%.  If he were treated in Class

6 he would not be issued any stock in the reorganized Debtor because his stock was issued in

consideration for his services, not for cash.

Under general corporations law, shareholders in the same class are accorded votes,

dividends and other rights based on their percentage of the outstanding shares, not on the basis of

what they paid for their stock.  The formula for issuing new shares to shareholders based on their

cash investment discriminates unfairly and is not fair and equitable to those shareholders who

contributed services rather than cash.  The formula is a thinly disguised ploy to wipe out the Rui

brothers and shift majority ownership to GVFI.

## <u>CONCLUSION</u>

The plan has not been proposed in good faith.  It is not in the best interests of creditors

and shareholders and is not feasible.  Also, the plan does not treat the Class 7 interest holders

fairly.  Confirmation is denied.

Dated: December 18, 2009                     */S/ Raymond T. Lyons*
                                                                    United States Bankruptcy Judge